UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------
IN RE:

     KENT DOUGLAS SORBER          CASE NO. 05-63527

               Debtor         Chapter 7

-----------------------------------------------------------
KENT DOUGLAS SORBER

            Plaintiff

      vs.              ADV. PRO. NO. 05-80195

NEW YORK STATE HIGHER EDUCATION
SERVICES CORPORATION and SALLIE MAE
LOAN SERVICING CENTER

            Defendants

----------------------------------------------------------
APPEARANCES:

KENT DOUGLAS SORBER
Pro Se
9946 Baker Rd.
Weedsport, NY 13166

WHITEMAN OSTERMAN & HANNA LLP     JOHN J. HENRY, ESQ.
Attorneys for Defendant Educational Credit    Of Counsel
   Management Corporation           WILLIAM S. NOLAN, ESQ.
One Commerce Plaza              Of Counsel
Albany, New York 12260


Hon. Stephen D. Gerling, Chief U.S. Bankruptcy Judge


**MEMORANDUM-DECISION, FINDINGS OF FACT,
CONCLUSIONS OF LAW AND ORDER**


    Before this Court is an adversary proceeding commenced on August 8, 2005 by Kent

Douglas Sorber ("Debtor") by the filing of a complaint against Educational Credit Management

2

Corporation ("ECMC"), as assignee of loans of the New York State Higher Education Services

and Sallie Mae Loan Servicing Center, seeking a discharge of student loans of the Debtor

pursuant to § 523(a)(8) of the Bankruptcy Code, 11 U.S.C. §§ 101-1330 ("Code").  Issue was

joined by the filing of an answer on behalf of ECMC on August 24, 2005.

A trial was held in Utica, New York, on February 13, 2006.  The Debtor was the only

witness to testify in support of his complaint.  Following his testimony, counsel for ECMC moved

to dismiss the complaint on the basis that the Debtor had failed to meet his burden of proof as to

the test set forth by the U.S. Court of Appeals for the Second Circuit in *Brunner v. New York*

*State Higher Educ. Servs. Corp.*, 831 F.2d 395 (2d Cir. 1987).  ECMC called no witnesses in

defense of the Debtor's complaint.  The Court reserved on the motion and provided the parties

with an opportunity to file additional memoranda of law.  The matter was submitted for decision

on March 14, 2006.

## JURISDICTIONAL STATEMENT

The Court has core jurisdiction over the parties and subject matter of this adversary

proceeding pursuant to 28 U.S.C. §§ 1134(b), 157(a), (b)(1), and (b)(2)(I).

## FACTS

The Debtor filed a voluntary petition seeking relief pursuant to chapter 7 of the Code on

May 4, 2005.  At the time of the trial, Debtor was forty-two years of age, residing in Weedsport,

3

New York. He testified that he is not currently married but has two daughters, ages 17 and 21.

According to the Debtor, he is required to make weekly payments of $62 in support of his 17 year

old daughter until she is 21 years old.[1] At the trial, the Debtor acknowledged that he owes

approximately $79,000 in student loans.[2] According to ECMC, over the years, the Debtor

received between 23 and 25 loans totaling $67,367.01[3] and that finance charges now total

$76,092.99, for a total of principal and interest of $143,460.[4] *See* ECMC's Exhibit 2.[5] The

Debtor testified that as recently as July 2002 he applied for consolidation of his loans, as well as

forbearance whereby he was granted an additional five years, during which apparently he was

---

[1] The Debtor testified that his daughter was to turn 18 later that month. According to the Debtor, despite the fact that his older daughter was now 21 years old, the weekly minimum payments were to remain the same for his other daughter until she also reached 21. He explained that his lawyer had advised him that if he were to seek a reduction in the amount, it was unlikely that the request would be granted since the weekly minimum support amount is currently $76 under the applicable State statute.

[2] According to Schedule E, filed with the Debtor's petition, he listed a student loan debt of $76,955.

[3] The Debtor disputed having received two loans listed by ECMC in the amounts of $6,740.74 and $4,140.61. He testified that he had registered for courses at Rochester Institute of Technology but because of the long commute, dropped out and never received any loans for those courses in the amounts listed.

[4] According to a letter from counsel for the New York State Higher Education Services, et al., dated January 10, 2006, the total loan balance was approximately $81,527 as of January 9, 2006. *See* ECMC's Exhibit 12. According to the letter, the Debtor is eligible for participation in the William D. Ford Direct Loan Consolidation Program. *Id.* Based on the Debtor's adjusted gross income of $13,624 from unemployment and a family size of two, under the Income Contingent Repayment Plan, it was estimated that his payments would be $13.23 per month. *Id.* The Debtor testified that he had rejected that offer based on his belief that he could not even afford that amount without undue hardship to himself and his family.

[5] At the close of the Debtor's testimony, ECMC indicated that it would not be calling any witnesses; however, it requested that certain exhibits be admitted into evidence. With the consent of both parties, the Court received by stipulation ECMC's Exhibits 1-12.

4

only expected to make interest payments. *See* ECMC's Exhibit 1. He testified that he was unable

to make even those payments of interest of $398 per month under the terms of that agreement.

Educational and Employment History

The Debtor testified that he obtained student loans between 1987 to 1990 while attending

Cayuga Community College in the evening and taking courses on the repair of computer chips.

Up until 1989, he resided with his fiancee and daughters and worked full-time at a steel mill in

Solvay, New York. In 1989 the steel mill closed and both his fiancee and daughters moved out

of the residence. In 1990, for approximately 6 months to a year, he was employed by R.E. Deitz,

in Syracuse, New York, doing maintenance and electrical work. In mid-1991 that facility also

closed.

In the spring of 1991 he received three loans in connection with classes at Onondaga

Community College. He testified that in the spring of 1992 he transferred to the State University

of New York at Cobleskill where he took courses in Thoroughbred management. During that

time, he estimated that he received eight additional loans. He completed three semesters there

before leaving in the spring of 1993 following an accident in which he fractured his left ankle

after having been thrown from a horse. In the fall of 1993 he enrolled at Morrisville State

College, intending to take courses in Standardbred management. After approximately one and

a half months, he dropped out because of the lengthy commute from his home in Weedsport.

In the spring of 1994 he attended evening courses at Onondaga Community College while

working as a computer operator for GTE. He testified that he obtained three student loans during

that period and earned approximately $11,000 in 1994. According to the Debtor, in the spring

of 1996 GTE downsized and moved out of state. The Debtor enrolled in Onondaga Community

5

College in the spring and fall semesters of 1996 on a full-time basis, obtaining nine student loans. He received no degree, however.

It was the Debtor's testimony that he obtained a job at the OnBank Data Center in the Fall of 1997 where he was employed for approximately a year before it was sold to M&T Bank and the data center closed. According to the Debtor, he worked in a variety of temporary jobs until 2000 when he obtained employment at POMCO. On or about September 28, 2005, he was informed that his position was being eliminated. Since then, the Debtor testified that he has been collecting unemployment while looking for other positions using the internet. He testified that most of the positions require 3-5 years experience as a computer programmer, which he does not have. He has not had any interviews. He acknowledged on cross-examination that he has limited his job search to the Rochester, Auburn and Syracuse, New York areas. He testified that he had not looked for employment as far away as Buffalo, New York.

When asked about employment other than information technology positions, the Debtor testified that although there were positions available, they did not pay as much as he was receiving in unemployment benefits.

Debtor's Income and Expenses

At the time that the Debtor filed his petition, he was employed by POMCO, earning $2,096 per month in gross income. The Debtor testified that at the time of the trial he was collecting unemployment of approximately $13,000 per year.

According to the Debtor's Social Security Statement, in 1999 he earned $22,467; in 2000 $10,335, and in 2001 $26,653. *See* ECMC's Exhibit 7. According to his 2002, 2003 and 2004

6

income tax returns, he earned adjusted gross income of $29,064, $29,914.18 and $25,154,

respectively.  *See* ECMC's Exhibits 5, 6 and 8.

The Debtor acknowledged that he had never made any payments on his student loans since

1987.  He explained that for 10 of those 18 years, his earnings were below the poverty line.

According to the schedules filed with his petition, Debtor's expenses exceeded his income by

approximately $300 per month.  *See* Exhibits I and J of his Petition (ECMC's Exhibit 3).  At the

trial, he testified that ultimately in 2005 he experienced a shortfall of approximately $596 per

month once he was on unemployment.  In 2006 the shortfall has amounted to more that $1,000

per month.  He explained that since filing he has had additional expenses including taxes, real

property taxes, gas for his car, trash removal, and water treatment costs.  He currently owes the

IRS approximately $7,000.  He also testified that he had not included in his schedules back taxes

owed to the IRS and New York State of approximately $2,200 in 2002 and $2,400 in 2003.  He

also owes them for 2004 and 2005 although he did not indicate the amounts.  He is driving a 1989

Dodge Dynasty with more than 160,000 miles and currently has no car payment.  He has no

medical insurance and cannot afford his medications for high cholesterol and medical coverage

for his daughter.

He alleges that he holds an equitable interest in the land on which his mobile home is

located pursuant to a land contract on or about November 15, 1999.  *See* Schedule A, filed with

his petition.  According to Schedules A and D, he owed $20,268.45 on the "land loan" in May

2005.  In addition, he listed $1,180.74 owed on the 1986 mobile home.  In his schedules, he listed

$160 per month for transportation, which he testified was based on commuting to POMCO.  He

acknowledged he is no longer commuting, and the actual expenses were somewhat less.  He also

7

subscribes to DirectTV for a monthly charge of $45.99, along with a monthly charge of $23.00

for HBO and Sports.  *See* ECMC's Exhibit 9.  According to the Debtor, his mother, in whose

name the account with DirectTV is listed, agreed to pay any amounts in excess of $50 per month

in order that his daughter would have something to watch when she visited the Debtor on

weekends.   He also has an account with America Online, which costs $28.90 per month.  *See*

ECMC's Exhibit 10.  He testified that he uses the computer to access the internet in connection

with his job search.


## DISCUSSION


Code § 523(a)(8) is applicable to loans "made, insured, or guaranteed by a governmental

unit, or made under any program funded in whole or in part by a governmental unit or nonprofit

institution . . . ."  11 U.S.C. § 523(a)(8).  Congress, in enacting the statute, was cognizant of the

fact that

> educational loans are different from most loans.  They are made without business
> considerations, without security, without cosigners, and rely [] for repayment
> solely on the debtor's future increased income resulting from the education.  In
> this sense, the loan is viewed as a mortgage on the debtor's future.

H.R. Rep. No. 595, 95th Cong., 1st Sess. 133 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5787, 6094.

The U.S. Court of Appeals for the Second Circuit established a three-prong test for a

debtor seeking an undue hardship discharge under Code § 523(a)(8) in its 1987 decision in

*Brunner*, which has found favor in a number of other circuits.  *See, e.g., In re Faish*, 72 F.3d 298

(3d Cir. 1995); *In re Frushour*, 433 F.3d 393 (4th Cir. 2005); *In re Gerhardt*, 348 F.3d 89 (5th

8

Cir. 2003); *In re Tirch*, 409 F.3d 677 (6th Cir. 2005); *In re Goulet*, 284 F.3d 773 (7th Cir. 2002);

*In re Rifino*, 245 F.3d 1083 (9th Cir. 2001); *In re Alderete*, 412 F.3d 1200 (10th Cir. 2005); *In

re Cox*, 338 F.3d 1238 (11th Cir. 2003).[6]  The Debtor must prove

> (1) that the debtor cannot maintain, based on current income and expenses, a
> 'minimal' standard of living for [himself] and [his] dependents if forced to repay
> the loans; (2) that additional circumstances exist indicating that this state of affairs
> is likely to persist for a significant portion of the repayment period of the student
> loans; and (3) that the debtor has made good faith efforts to repay the loans."

*Brunner,* 831 F.2d at 396.  Furthermore, all prongs of the three-prong "undue hardship" test must

be met in order for the debt to be discharged. *See id.*  If the Debtor fails to prove one of the

*Brunner* elements, the Debtor's educational loans cannot be discharged.  *See In re Wetzel*, 213

B.R. 220, 225 (Bankr. N.D.N.Y. 1996).

> As noted by the Third Circuit Court of Appeals in applying the *Brunner* test,

> the *Brunner* standard safeguards the financial integrity of the student loan program
> by not permitting debtors who have obtained the substantial benefits of an
> education funded by taxpayer dollars to dismiss their obligation merely because
> repayment of the borrowed funds would require some major personal and
> financial sacrifices.

*Faish*, 72 F.3d at 305-306.


Minimum and Maximum Analysis

　　　The first prong of the *Brunner* test requires the Court to examine whether the Debtor has

demonstrated, based on his current income and expenses, that he cannot maintain a minimal

standard of living for his family and repay his educational loans.  *Brunner*, 831 F.2d at 396.  It

---

　　　[6]  The Eight Circuit has adopted a totality of circumstances test in determining undue
hardship.  *See, e.g., In re Long*, 322 F.3d 549 (8th. Cir. 2003), citing with approval, *In re Andrews*,
661 F.2d 702, 704 (8th Cir. 1981).

9

is clear from the evidence and testimony elicited at the trial that the Debtor is presently struggling

financially to support himself and his daughter while collecting unemployment benefits.  He

cannot afford medical insurance for either himself or his daughter.  His monthly expenses appear

reasonable, with the exception of the amount allocated for transportation.  However, it is also

noted that by receiving a discharge in his chapter 7 case, he also has been able to discharge the

rest of his unsecured debt amounting to approximately $20,250.  *See* Schedule F, attached to

Debtor's Petition (ECMC's Exhibit 3).

For purposes of the first *Brunner* factor, the debtor "must demonstrate more than simply

tight finances; the proper inquiry is whether it is unconscionable to require debtor to earn more

income or reduce expenses." *Shank v. American Educ.* Servs., Case No. 05-3655, 2006 WL

2374869, at * 1 (D. Ariz. Aug. 15, 2006) (citation omitted).  As the court in *Shank* noted, there

is a presumption that the debtor's income will increase over time barring any "'insurmountable

barriers to the debtor's financial recovery and inability to pay.'" *Id.* at *2 (citation omitted).

At the time of the trial, the Debtor was collecting unemployment.  There was no evidence

presented indicating any serious physical or mental disabilities that would prevent the Debtor

from eventually obtaining employment either in the Central New York area or in other areas of

the country.  However, as of the date of the trial he was, in the view of the Court, maintaining

only a minimal standard of living.  Accordingly, the Court finds that the Debtor has established

this particular prong of the *Brunner* test.

Duration of Inability to Repay Loans

The second prong of the *Brunner* test requires that the Debtor prove more than his present

10

inability to pay his student loan obligations. *Id.* He must also establish that his current financial hardship is likely to be long-term. *Id.* "This factor properly takes into account the nature of education as a long term investment that may not pay dividends for years to come." *In re Vinci*, 232 B.R. 644, 652 (Bankr. E.D. Pa 1999); *see In re Briscoe*, 16 B.R. 128, 131 (Bankr. S.D.N.Y. 1981) (indicating that the dischargeability of student loans is "based upon the certainty of hopelessness, not simply a present inability to fulfill financial commitment."). What is important for the Court to consider is whether there are "unique" and "exceptional" circumstances, beyond the reasonable control of the Debtor, that would prevent future employment and the ability to repay the debt. *See In re Cahill*, 93 B.R. 8, 13 (Bankr. N.D.N.Y. 1988) (citation omitted). He must demonstrate to the Court that his current financial hardship is likely to be long-term. *Id.*; *see also Brunner*, 831 F.2d at 396 (indicating that the evidence must establish "exceptional circumstances, strongly suggestive of continuing inability to repay over an extended period of time ..."); *In re Garrett*, 180 B.R. 358, 363 (Bankr. D.N.H. 1995) (citations omitted) (stating that the "inability to pay which can constitute undue hardship must be long-term and not simply a temporary loss of income.").

In this case, the Debtor did not obtain a degree after his several forays into various college programs. However, he does have experience with computers, albeit not at the level of a computer programmer but as a computer operator. According to allegations in his complaint, his ankle injury in 1993, of which he testified, does preclude him from being on his feet for eight continuous hours and his wrist injury, which occurred as a result of a fall from a ladder in 2003, prevents him from doing any heavy lifting. However, these injuries obviously did not preclude him from employment between 2001 and 2005 when he earned between $26,000 and $29,000 per

11

year as a computer operator at POMCO.

Although he is currently unemployed, it is reasonable to believe that he will be able to work for at least another 20 years. *See In re Kenny*, 313 B.R. 100, 107 (Bankr. N.D.N.Y. 2004). He testified that he has only sought employment in the central New York region. This Court has previously denied a debtor a discharge in similar circumstances on the basis that she had "made no cognizable effort to find better paying employment in her career field [graphic arts], albeit outside the Cortland/Ithaca, New York area, that would demonstrate to this Court that her employment opportunities are, indeed, limited and that her current financial situation is likely to continue, making repayment difficult." *Kielar v. Rochester Inst. of Technology (In re Kielar)*, Case No. 93-61343, Adv. Pro. 93-70106, slip op. at 9-10 (Bankr. N.D.N.Y. March 4, 1994); *see also Muto v. Sallie Mae, et al. (In re Muto),* Case No. 94-62735, Adv. Pro. 94-70184, slip op. at 13 (Bankr. N.D.N.Y. Feb. 13, 1996) (finding that debtor had "failed to provide the Court with any concrete evidence of his efforts to obtain employment commensurate with his apparent intellectual abilities and educational background either in Syracuse or other areas of the country").

Thus, based on the evidence, the Court cannot conclude that the Debtor's current unemployment status will continue indefinitely. While he may be hesitant to relocate, particularly given his interest in real property in the Syracuse area on which his mobile home is situate, that is not a sufficient reason to limit his search for employment. Nor is the fact that Debtor's now 18 year old daughter visits him on weekends. He did not indicate where she lives or whether she will be attending college in the fall. Assuming that she lives somewhere in the vicinity of the Debtor, in the view of the Court, is also not a valid reason for the Debtor limiting his search. In fact, the Debtor admitted that there was other employment available to him; however, the pay was

12

less than what he was receiving from unemployment. Accordingly, the Court finds that the Debtor

has failed to convince it that factors exist beyond his reasonable control that would prevent him

from improving his financial situation.  The Court concludes that the Debtor has failed to meet

his burden of proof with respect to the second prong of the *Brunner* test.

Good Faith

The third prong of the *Brunner* test requires the Debtor to establish that he has made a

good faith effort to repay the loans. *Brunner*, 831 F.2d at 396.  Good faith is a moving target that

must be examined in light of the particular circumstances of the Debtor.  *In re Maulin*, 190 B.R.

153, 156 (Bankr. W.D.N.Y. 1995).  The Court is to examine the history of the Debtor's payments,

his use of deferments and his exploration of employment options.  *Id.*

At the trial, the Debtor testified that as recently as 2002 he had taken advantage of the

opportunity to consolidate his debt and to obtain a deferment.  However, he also testified that he

had not made a single payment on the debt before or after the consolidation despite the fact that

between 2001 and 2005 he earned in excess of $20,000 per year.  Most recently, he acknowledged

that he had rejected an offer to make payments of $13 per month while on unemployment.[7]  As

---

[7] One of the repayment programs available to the Debtor under the "Ford Program" is the Income Contingent Repayment Plan.  *See* 34 CFR § 685.209(a).  Under that program, "the amount of a debtor's monthly payments on a student loan are based upon the debtor's adjusted gross income less the amount set forth in the HHS Poverty Guidelines. . . . Under this formula, the borrower is required to pay 20% of disposable income . . . . [and] the amount of monthly payment is recalculated on a yearly basis. . . . If the debtor's income is below the poverty level for his family size, then a debtor does not have any monthly payment to make. . . . Furthermore, the program allows a debtor to extend the student loan payments over a 25-year period. . . . At the end of the period, if the borrower has not repaid the loan in full, the remaining loan balance is cancelled." *In re Southard*, 337 B.R. 416, 421 (Bankr. M.D. Fla. 2006).

13

the courts have noted, a debtor's failure to diligently pursue such repayment options is to be

considered when applying the good faith requirement set forth in *Brunner.   See In re*

*Cunningham,* Case No. 04-2636, Adv. 04-105, Civ. A. 5:05CV198, 2006 WL 1133923, at *4

(N.D.W.Va. Apr. 26, 2006) (citations omitted).   These facts, along with the Debtor's limited

efforts to obtain employment only in the Central New York area, support a finding of a lack of

good faith on his part in attempting to improve his financial condition and to repay his debt.

Based on the foregoing, it is hereby

ORDERED that the Debtor's complaint is dismissed based on his failure to meet his

burden by a preponderance of the evidence under the standards set forth in *Brunner*; and it further

ORDERED that the debt owed to ECMC is determined to be nondischargeable pursuant

to Code § 523(a)(8).

Dated at Utica, New York

this 6th day of September 2006

/s/    Hon. Stephen D. Gerling
STEPHEN D. GERLING
Chief U.S. Bankruptcy Judge